Frank DeMartino and Raffaela DeMartino v. Commissioner.
De Martino v. Commissioner
Docket No. 46035.
United States Tax Court
T.C. Memo 1954-188; 1954 Tax Ct. Memo LEXIS 58; 13 T.C.M. (CCH) 1017; T.C.M. (RIA) 54294; November 5, 1954, Filed *58 Petitioner Frank DeMartino owned and operated a small grocery store. The only business books and records maintained were a small inaccurate account book for two of the five years involved, and cancelled checks, paid invoices and bank statements. Tax returns for each year were filled out by an accountant from information furnished him orally by Frank and from the inaccurate account book. On the facts, it is Held: 1. Determination of total receipts by bank deposits plus cash expenditures method is proper under the circumstances; 2. Net income was understated in the return filed for each of the years 1942 through 1946; 3. A part of the deficiency for each of the years 1942, 1943 and 1944 was due to fraud with intent to evade tax; 4. Assessments of deficiencies for the years in question are not barred by limitations. Herbert L. Cohen, Esq., and Paul L. Blawie, Esq., for the petitioners. Joseph Landis, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion Respondent determined deficiencies and additions to tax under section 293(b) of the *60 Internal Revenue Code of 1939, as follows: Penalty
Years
Income Tax
Sec. 293(b)
1942
$14,250.99
$ 7,125.50
1943
26,834.60
13,417.50
1944
17,730.81
8,865.41
1945
5,954.51
2,977.26
1946
6,329.08
3,164.54
Total
$71,099.99
$35,550.21
The issues involved are whether respondent properly determined the amount of the deficiencies, whether there were deficiencies due in part to fraud with intent to evade income taxes, and whether assessment of any of the deficiencies was barred by limitations. Findings of Fact Some of the facts were stipulated, and, to the extent so stipulated, are included herein by this reference. Petitioners are man and wife. They filed a joint income tax return for the year 1943. Petitioner Frank DeMartino filed separate individual income tax returns for the years 1942, 1944, 1945 and 1946. All returns were filed with the then collector for the district of Connecticut. The 1943 return was the only return in which petitioner Raffaela DeMartino joined. She filed no return for any of the other years in question. Before the expiration of the prescribed times for the assessments of income tax against Frank for the years 1944, *61 1945 and 1946, he and respondent executed agreements from time to time pursuant to section 276(b), Internal Revenue Code of 1939, to extend the time for such assessments until June 30, 1953. The Notice of Deficiency in the instant case was mailed to petitioners on September 25, 1952. Frank was born in Italy in 1896 and came to the United States when he was nine years old. His formal education ceased at the age of 13 years after he had attended school through the first 10 days of the fourth grade. Thereafter he was employed as a laborer until 1918 when he entered the Army in which he served for 18 months. Shortly after his return to civilian life, he became a naturalized citizen of this country. In 1922, Frank purchased a small grocery business in Derby, Connecticut, which he owned and operated until its sale on March 6, 1946. Later in 1922, he and Raffaela were married. They subsequently had three children, William, Frank, Jr., and Nancy, who were born two years apart. The oldest child, William, born in 1925, was killed in action in 1945 during the Battle of the Bulge. The children attended public school and none of them went beyond high school. The family occupied two 4-room *62 apartments in a 6-family house in Ansonia, Connecticut, which Frank had purchased for about $13,000 in 1929. In 1942, each of the other four apartments was rented at the rate of $18 per month. The family automobile was a 1942 Dodge which Frank traded in for a Buick in 1946. The store in Derby in which Frank conducted the grocery business was rented to him at a rate of $25 per month. It was about 20 feet wide and 30 feet deep with a back room about six feet deep. In June 15, 1943, Frank purchased the store building at a total cost of $8,264.59, of which $4,000 was borrowed on a mortgage on the premises. The balance was paid by check. During the period 1942 through 1946, the business was operated by Frank with some assistance from Raffaela and the children. Frank also owned a Chevrolet truck which was used in the business by a part-time employee for the delivery of merchandise to customers. Frank sold meats as well as groceries at his store. For many years prior to 1942 he had purchased cattle, hogs and poultry from farmers in the vicinity of Derby and had slaughtered and dressed each item for sale. Frank always paid cash for these purchases of livestock. During the period 1942 *63 through 1946, Frank continued this "cattle business." He was also supplied with limited amounts of meats for sale at his store by regular meat-packing companies. Frank maintained one checking account, with the Ansonia National Bank, during the period 1942 through 1946. The total deposits to the checking account for each year 1942 through 1946 are as stated in Schedule A below. The only items deposited in the checking account which were not receipts from Frank's business during this period are as follows: (a) Rents received from tenants of the residential building owned by Frank in the amounts set forth in Schedule A. (b) $10,900 of the proceeds of the sale of the business received in 1946. (c) Disability pension payments received by Frank each year as stated in Schedule A. (d) Life insurance proceeds in the amount of $500 received in 1944 upon the death of Raffaela's mother. (e) National Service Life Insurance payments received in 1945 and 1946 upon the death of William DeMartino in the amounts indicated in Schedule A. SCHEDULE A
Deposited Receipts
1942
1943
1944
1945
1946
Total checking account deposits
$71,292.17
$88,677.05
$89,186.50
$51,584.89
$39,915.79
Less non-sales items: (a) Rents
$ 864.00
$ 1,338.00
$ 1,848.00
$ 1,848.00
$ 2,093.00
(b) Proceeds - sale of business
10,900.00
(c) Pension
540.00
540.00
567.00
621.00
652.05
(d) & (e) Life insurance
500.00
460.00
552.00
Total non-sales items
$ 1,404.00
$ 1,878.00
$ 2,915.00
$ 2,929.00
$14,197.05
Business receipts deposited
$69,888.17
$86,799.05
$86,271.50
$48,655.89
$25,718.74
*64 During this period, the total annual withdrawals by check from the checking account for all purposes, including some personal, capital and other nondeductible expenditures, were as follows: 1942
1943
1944
1945
1946
$69,073.87
$84,950.17
$91,393.71
$54,524.01
$31,796.83
During the period 1942 through 1946, some of the business receipts were not deposited in the checking account, but were expended in cash by petitioners. The amounts and purposes of these cash expenditures are as follows: (a) Frank purchased livestock for cash. For this and other purposes, he kept about $200 in cash on hand at all times. During this period, Frank purchased livestock for cash in the amounts set forth in Schedule B below. (b) Frank also made cash purchases from a cooperative association during this period in the amounts indicated in Schedule B below. (c) One-half of the business expenses, with the exception of merchandise bought for sale, and one-half of petitioners' personal deductible expenses were paid in cash during this period in the amounts set forth in Schedule B below. (d)During each of the years 1942 through 1945 and in 1946 until the business was sold *65 on March 6, 1946, petitioners withdrew about $25 per week in cash from the business receipts for the personal living expenses of the DeMartino Family. Respondent, in his answer, alleges the withdrawals for this purpose to be $1,200 per year, and we limit the amount accordingly. (e) In 1945, Frank made a cash principal payment of $1,000 on the mortgage which he had granted in 1943 when he purchased the building in which the grocery store was located. The following Schedule B sets forth the total amounts of business receipts for each year in question which were expended in cash by petitioners (and consequently not reflected in the checking account deposits mentioned in Schedule A above): SCHEDULE B
Business Receipts Expended in Cash
1942
1943
1944
1945
1946
(a) Livestock purchases
$ 6,178.26
$4,986.32
$ 6,031.25
$ 4,788.70
$ 505.73
(b) Co-operative purchases
382.17
501.37
396.88
521.13
449.43
(c) Expenses and deductions
2,511.85
2,493.31
2,855.83
2,723.91
1,553.26
(d) Living expenses
1,200.00
1,200.00
1,200.00
1,200.00
225.00
(e) Mortgage payment
1,000.00
Total business receipts expended in
cash
$10,272.28
$9,181.00
$10,483.96
$10,233.74
$2,733.42
*66 The total receipts of the business for each of the years involved in this proceeding were as follows: SCHEDULE C
Total Receipts
1942
1943
1944
1945
1946
Deposited receipts (from Schedule A)
$69,888.17
$86,799.05
$86,271.50
$48,655.89
$25,718.74
Expended receipts (from Schedule B)
10,272.28
9,181.00
10,483.96
10,233.74
2,733.42
Total receipts
$80,160.45
$95,980.05
$96,755.46
$58,889.63
$28,452.16
Petitioners' usual practice during the period 1942 through 1946 with respect to the business receipts was as follows: Frank brought the receipts home each week and placed them on the table. After funds had been set aside for household use and for the use of Frank in the business, a deposit slip for the checking account was made out either by Frank or Raffaela. The funds were deposited in the bank weekly by Raffaela. Raffaela, who had gone to school as far as the seventh grade, made out most of the checks for Frank's signature as well as most of the deposit slips. She also reconciled the bank statement each month, and thereafter she placed it, together with the cancelled checks and paid invoices, in a shoe box. These were the *67 only business records kept by petitioners during the years 1942 through 1946, with the exception of a small account book concerning the years 1944 and 1945 which is discussed infra. The shoe boxes in which Frank's cancelled checks and other records were kept were stored in the cellar of the store where they were located at the time the business was sold in 1946. All of such records, other than cancelled checks and bank statements for four months of 1945, were subsequently destroyed by the purchaser of the business. Petitioners' Federal income tax returns for the years 1942 through 1946 were made out by a self-educated public accountant who charged about five or ten dollars for his services. For each of the years 1942 and 1943, Frank told the accountant that he estimated his average weekly gross receipts to be about $1,000 or slightly higher. The accountant converted these weekly figures into annual unrounded amounts and reported $53,047.86 and $57,346.81, respectively, as "total receipts" in the tax return for the two years above indicated. The so-called total receipts were admittedly estimates. During 1942, there were 54 deposits made to Frank's checking account of which the *68 lowest was in the amount of $206.48 and the highest was in the amount of $1,889.78. Only two of the deposits were in amounts under $1,000. The total of all these deposits was $71,292.17 of which all but $1,404 were receipts from the business. See Schedule A, supra. During 1943, there were 52 deposits to the checking account of which the lowest was in the amount of $1,366.56 and the highest was in the amount of $2,229.94. The total of all these deposits in 1943 was $88,677.05 of which all but $1,878 were receipts from the business. See Schedule A, supra. The accountant himself estimated the cost of "merchandise bought for sale" in each of the years 1942 and 1943 as set forth in Schedule D below. He reported in the return for each of those years a figure which, if sold by petitioner at a gross profit of about 16 per cent, would result in the "total receipts" reported in the same return. The accountant suggested to Frank at the time he made out the returns for both 1942 and 1943 that records be kept of the store's business, but Frank replied that he was too busy and too uneducated to keep books himself and that he could not afford to pay an accountant to keep them for him. Petitioners *69 took the position that, because the business was a family affair, books and records, other than cancelled checks and bank statements, were unnecessary. Frank realized, however, that he had a duty to report his entire profit accurately in his income tax return. During the taxable years 1944 and 1945 entries were made in a small account book by the accountant and by petitioners' son, Frank, Jr., who was then working in the store with his father. This account book did not accurately reflect the store's receipts or net profits for either year, however. The headings for some of the accounts in the book were written there by the accountant including the two following: (1) "Merchandise Purchases by week. Total all check & cash paid out for each week." (2) "Cash Receipts Total Register Reading end of week." Entries purporting to be the weekly totals of the above two items were totaled by the accountant and the annual figures so obtained were used by him as "Merchandise bought for sale" and "total receipts" respectively in the returns for 1944 and 1945. See Schedule D below. In the 1944 return, the amount of total receipts reported in Frank's return was $66,560.90. During that year, *70 there were 53 deposits to the checking account. One of the deposits was $6.22. All of the other deposits exceeded $1,000. Twelve of them were in excess of $2,000, the highest being $2,468.15. The total of all of these deposits was $89,186.50 of which all but $2,915 were receipts from the business. See Schedule A, supra. The 1946 return was made out after Frank had sold the store. The accountant came to petitioners' apartment and obtained from Frank an estimate of the total receipts of the business and the cost of merchandise bought for sale for the period in 1946 during which Frank was the proprietor of the business. These figures, as indicated in Schedule D below, were reported in the return for that year. The tax returns for each of the years 1942 through 1946 reported with respect to the business (1) total receipts, (2) merchandise bought for sale, (3) other deductions (including inventory adjustments), and (4) net profit as follows: SCHEDULE D
Reported Business Items
Total
Merchandise
Other
Year
Receipts
Bought for Sale
Deductions
Net Profit
1942
$53,047.86
$46,016.18
$4,151.95
$2,879.13
1943
57,346.81
50,083.27
3,972.95
3,290.59
1944
66,560.90
58,695.00
4,979.99
2,885.91
1945
52,584.93
45,926.80
4,075.34
2,582.79
1946
26,586.42
21,219.50
2,775.53
2,591.39
*71 After each return was made out by the accountant, he and Frank reviewed it together before Frank (and Raffaela, with respect to the 1943 return) signed it. Frank was aware of the fact that only a very small net profit from the business was being reported in each return. At the time each return was made out by the accountant, he and petitioners knew that bank statements and cancelled checks for the taxable year involved were available either in the basement of the store or elsewhere. The accountant did not request to see these records nor did petitioners offer them to the accountant for his use in making out the returns. The accountant and petitioners also knew at the time each return was made out that some cash receipts had been used by Frank to purchase goods for sale in the business. No records, other than the account book in 1944 and 1945, were made available to the accountant, and the amounts entered in the tax returns (other than those taken from the account book kept in 1944 and 1945) were estimated by either Frank or the accountant. The tax returns understated the total receipts of the business for each pertinent year in the amount set forth in Schedule E below. Cost of *72 merchandise bought for sale was understated in each year to an extent which we estimate to be not less than 65 per cent of the business receipts omitted from the return for each year. (See Schedule E.) Other costs and expenses were not greater than the amounts deducted therefor in the returns. Schedule E also sets forth the amount of unreported net profit from the business for each taxable year involved herein. SCHEDULE E
Unreported Net Profit from Sale of Merchandise
1942
1943
1944
1945
1946
Total receipts (from Schedule C)
$80,160.45
$95,980.05
$96,755.46
$58,889.63
$28,452.16
Less: Reported receipts (from Schedule D)
53,047.86
57,346.81
66,560.90
52,584.93
26,586.42
Unreported receipts
$27,112.59
$38,633.24
$30,194.56
$ 6,304.70
$ 1,865.74
Less: Unreported merchandise bought for sale
17,623.18
25,111.61
19,626.46
4,098.06
1,212.71
Unreported net profit from sale of mer-
chandise
$ 9,489.41
$13,521.63
$10,568.10
$ 2,206.64
$ 653.03
During all of the period involved in the instant case until Frank sold the business in 1946, all of the food required for petitioner's household was taken from the store. No *73 record was kept of the value of the food. During 1942 and 1943, the household consisted of five persons. During the subsequent years involved, it consisted of four persons. In some of the returns filed by Frank an amount was included in income purportedly to reflect the value of such food consumed. The value of the food and the amount by which the reported total income was understated for each of the years in question due to unreported consumption is as follows: Food
1942
1943
1944
1945
1946
consumed:
$1,250
$1,250
$1,000
$1,000 $167
Less value
reported:
400
None
600
600
None
Understate-
ment of
income:
$ 850
$1,250
$ 400
$ 400 $167
Net income was understated in the income tax returns here involved for the years 1942 to 1946, inclusive. A part of the deficiencies for each of the years 1942, 1943 and 1944 was due to fraud with intent to evade income taxes, and the returns filed for each of said three years were false and fraudulent and were filed with intent to evade income taxes. Opinion FISHER, Judge: Petitioner Frank DeMartino owned and operated a small grocery store in Derby, Connecticut. He had acquired this business *74 in 1922 and he conducted it with the help of his wife, Raffaela, and later their children, until its sale in 1946. Respondent determined deficiencies in income tax of petitioners, due primarily to the understatement in the returns of total receipts and net profits of the business, for each of the years 1942 through 1946. He also determined that each of the deficiencies was due in part to fraud with intent to evade tax, and he accordingly imposed the 50 per cent penalty pursuant to section 293(b), Internal Revenue Code of 1939. Petitioners contend that the deficiencies were not properly determined by respondent, that no part of any of the deficiencies was due to fraud with intent to evade tax, and that assessment of any of the deficiencies is barred by the period of limitations pursuant to section 275, Internal Revenue Code of 1939. We shall discuss each of these contentions in the order listed. We turn first to the issue of whether or not respondent properly determined deficiencies for the years in question. Respondent determined that the return filed for each of the years 1942 through 1946 understated the amount of total receipts and net profit from the operation of the business. *75 He determined the correct amount of total receipts for each year by the use of what is known as the bank deposit plus cash expenditure method. For the reasons indicated below, we believe that the use of this method was reasonable and proper under the provisions of section 41, Internal Revenue Code of 1939, and our finding of total receipts was based thereon. See Schedule C in our Findings. In the operation of his business, Frank kept no books except during the years 1944 and 1945 when an account book was maintained. This book was inaccurate and did not clearly reflect the total receipts or the total costs of the business. The total receipts reported in the returns for 1942, 1943 and 1946 were based on estimates made by Frank of the volume of his business. Those reported in the 1944 and 1945 returns were taken from the inaccurate account book. During this period, Frank maintained a checking account with the Ansonia National Bank to which weekly deposits of most of the business receipts were made. See Schedule A in our Findings of Fact. It was Frank's practice to pay some costs of his business with cash withdrawn from the receipts of the business and also to withdraw some cash from *76 the receipts for the personal use of the family. See Schedule B in our Findings of Fact. Since the amount of cash withdrawn was not reflected in the deposits made to the checking account, we have added the two in order to determine total business receipts for each of the years in question. See Schedule C in our Findings. During these years, petitioners' method of accounting did not clearly reflect income. Perhaps we would be more accurate if we said that, largely, there was no method at all. Under these circumstances, we believe that the bank deposit plus cash expenditure method was properly applied, and presented the most reliable available evidence of total business receipts. In calculating the amount of each year's deposited receipts, we have made allowances for amounts from sources which were not receipts from the store business. Similarly, the amount of cash expended does not include cash received from sources other than the store's sales. The parties stipulated that petitioners did not receive during this period any amounts of money by inheritance or gift. Thus, in the absence of evidence by petitioners to attribute the amounts set out-in Schedule C of our Findings to other *77 sources, we are justified in holding that they are business receipts. Halle v. Commissioner, (C.A. 2, 1949) 175 Fed. (2d) 500, affirming 7 T.C. 245. Respondent contends that all of the unreported receipts represent additional taxable net income to petitioners, and he allows nothing for unreported cost of goods sold. If we were to agree with this contention, the result would be a grossly exaggerated unreported net income from the store for each of the years in question. (The total amount of unreported receipts for the slightly more than four years of operations, as set out in Schedule E of our Findings, is about $104,000.) We are convinced by the evidence in the instant case that petitioners' income during this period was not remotely comparable to that contended by respondent. In reaching this conclusion, we have given consideration to the substantial extent to which checks for each year exceeded reported cost of merchandise and other expenses, and to the frugal mode of living and the limited increases in net worth of the DeMartino family. As hereafter set forth, therefore, we make such adjustments with respect to unreported cost of goods sold as are, in *78 our opinion, supported by the record as a basis for determining a realistic unreported net income for each year in question. See Harris v. Commissioner, (C.A. 4, 1949) 174 Fed. (2d) 70, 73. Respondent determined that the cost of goods sold and the deductible expenses of the business for each of the years involved were no greater than the amounts shown on the returns for those years. It is our view that the reported costs did not include the cost of a substantial amount of merchandise, the sale of which gave rise to unreported receipts. Accordingly, in our Findings (Schedule E) we have determined the amount by which the cost of merchandise bought for sale was understated for each year, and we have subtracted this amount from the unreported receipts in order to determine the unreported net profit in each year. The reported amount of the cost item "Merchandise bought for sale" was estimated for each of the years 1942 and 1943 by the accountant who made out the returns. He determined these amounts to be those which, if the merchandise were sold at a gross profit of about 16 per cent, would result in a "total receipts" figure equal to that estimated by Frank and reported *79 in the same return. Respondent has not questioned such costs as reported. The reported cost estimates, however, were based upon reported receipts and do not include cost estimates on merchandise sales, the proceeds of which were omitted from the returns. For each of the years 1944 and 1945, the amount of this cost item which was reported in the return was obtained by the accountant from the small account book. We believe that this book was inaccurate in reporting expenditures as well as in reporting receipts. Furthermore, the relationship between merchandise cost and total receipts on these two returns is strikingly similar to that between thetwo figures reported in the 1942 and 1943 returns. See Schedule D of our Findings. We have therefore concluded that cost of merchandise bought for sale was higher than reported for the years 1944 and 1945 to an extent substantially proportionate to the margin of error in other years. The amounts reported in the 1946 return both for cost of merchandise bought for sale and for total receipts were estimated by Frank and stated to the accountant who made out the return. His estimated merchandise cost was about 80 per cent of his estimated total *80 receipts for the few months of that year during which he owned and operated the business. His actual total receipts for that year were again higher than the reported figures, although not as much higher as in prior years. While less significant, the circumstances point to a corresponding increase in merchandise cost on the same basis which we have applied to unreported receipts in other years. Our approach to the determination of increased cost of merchandise attributed to unreported receipts from sales is as follows: Upon a consideration of the whole record, including the excess in each year of total checks over total reported cost of merchandise and expenses, we are convinced that there were costs attributable to the merchandise reflected in unreported sales which costs were likewise unreported, and which have a general relationship to unreported sales. We realize that there can be no precise determination of the amount of unreported costs. At the same time, to ignore such costs entirely or substantially would be to produce a harsh and unrealistic result. In estimating such costs, we take, of course, as a basic premise the view that all doubts should be resolved against the taxpayer, *81 because the problem is superinduced by the inadequacies of his own records and his failure to file proper returns. Keeping these considerations in the forefront of our mind, we note, on the other hand, that in the years 1945 and 1946, in which we found no fraud, and in which the unreported receipts and unreported net profit from business were relatively small, the reported merchandise costs were respectively about 88 per cent and 80 per cent of reported total receipts. We realize that these items were in themselves estimates, but there is no evidence in the case that the proportionate relationship between the items was substantially at variance with the truth. The accountant who participated in preparing the estimates appears to have had some experience with similar businesses and testified (without objection), in effect, that the margin of profit which he allowed was about right. The burden of proof in this respect is, of course, upon petitioners, but we note that respondent has not attempted to demonstrate that there was any substantial error in this approach. We have examined the overall picture, and in our judgment, if we allow 65 per cent of unreported receipts from the sale of *82 merchandise as the cost of such merchandise, the result will be fair to the respondent, give to petitioners all they may expect (as indirectly indicated by computations included in petitioners' brief) in the light of their failure to comply with the requirements for keeping records and filing returns, and avoid the harshness of a complete disregard of a most significant cost factor. Respondent also determined that the returns filed for the years in question understated income to the extent of the unreported value of food taken from the store by petitioners for home consumption. Petitioners submitted no evidence to indicate that respondent had erred in this determination and our Findings of Fact have sustained the determination. Likewise, petitioner assigned no error with respect to other minor adjustments for each of the years in question as determined by respondent. The net understatement of income for each year may be determined, therefore, on the basis of the adjustments determined herein and the further adjustments determined in the deficiency notice with respect to which no error was assigned. We turn now to the question of whether or not a part of the above deficiencies for *83 each year was due to fraud with intent to evade tax. We believe that respondent has sustained his burden of proof in this respect for the years 1942 through 1944. We have held otherwise with respect to 1945 and 1946. We consider the evidence concerning the earlier years first. It was Frank's practice each week to take the entire receipts home from the store. There he and Raffaela would count the week's receipts and set aside cash for household and family use (about $25 per week) and for the use of Frank in the business (to maintain a cash fund of about $200). The deposit slip for the checking account would then be made out, usually by Raffaela but sometimes by Frank, and the bank deposit would be made subsequently by Raffaela. We believe that Frank clearly knew the amount of the weekly bank deposits. The manner in which he ignored this and other knowledge is convincing proof of his intent to evade his true tax liability by filing false and fraudulent returns for the years 1942 through 1944. In 1942 and 1943, Frank informed the accountant of what he estimated were the average weekly receipts from the business. The accountant used these estimates in filling out the returns for those *84 years. The total receipts thus reported were $53,047.86 and $57,346.81, respectively, which reflect average weekly receipts of slightly more than $1,000. During those years, however, the total business receipts which had been deposited in the bank (ignoring for the moment the cash withdrawn from the business receipts) were $69,888.17 and $86,799.05, respectively. Moreover, during 1942 only two deposits were under $1,000 and the highest of the other deposits was in the amount of $1,889.78. During 1943, the lowest deposit was $1,366.56 and the highest was $2,229.94. These substantial discrepancies, we believe, clearly indicate that Frank was deliberately underestimating for tax purposes the size of his weekly receipts for the years 1942 and 1943. A similar situation obtained for the year 1944. The small account book, from which the accountant obtained the amount reported as total receipts in the return for that year, lists entries purporting to be weekly receipts in varying amounts between $1,027.89 and $1,658.75, a total of $66,560.94. During that year, however, 12 of the bank deposits were in amounts over $2,000, of which $2,468.15 was the highest, and the total amount of receipts *85 deposited was $86,271.50. Although it is true that some small part of the funds deposited in the bank account were not receipts from the business. That small part was much less than the cash which was withdrawn from the receipts. (See Schedules A and B of our Findings.) The deposits, therefore, were an excellent indication of at least a minimum amount of gross business receipts. The bank statements for each of the years 1942 through 1944 were readily available at the time the accountant made out each return. Frank did not produce them, however, even after the accountant had suggested that Frank keep some business records for tax purposes. (Nor did the accountant, who knew of the existence of the bank account, request that he be given the statements to assist him.) Instead, the returns for 1942 and 1943 were based upon an estimate by Frank of his weekly receipts, and that for 1944 was based upon entries in an inaccurate account book. As indicated by the size of the bank deposits alone, these estimates were grossly in error in favor of the taxpayer. Moreover, the errors persisted over at least a three-year period while the means of determining the extent of a major part of each error *86 in each return (the bank records) lay known but unused in the basement of the store immediately below the working accountant. Frank's failure to present the bank records to the accountant for use in preparing the returns for each year is unexplained. Likewise, there is no attempt to explain the discrepancy between the size of the bank deposits and the total receipts reported for each year. Such unexplained evidence is a strong indication that Frank deliberately failed to produce the records in order to conceal the intentional falseness of the information given to the accountant. In addition to the size of the deposits each week, Frank had knowledge of the fact that some cash out of each week's receipts was retained for family use and for his own use in the business during the following week. He also knew that some of the cash receipts were used during each week to pay for purchases and other business expenses. These sums also contributed to the total amount of the annual business receipts. The sum of these expended business receipts and deposited business receipts are substantially in excess of the reported total receipts for the three years in question. See Schedule E of our Findings. *87 We are impressed by the magnitude (about one-third of the total receipts) and consistency of these unreported receipts. The understatement of total receipts resulted in an understatement of business net profit for each of the three years. We have found that Frank was aware of the small size of the business net profit (and the net income) reported in each return. Moreover, the accountant called Frank's attention to the fact that he was "hardly making a living" out of the store, to which Frank would reply to the effect that conditions were bad and that it was difficult to make a dollar. During these three years (in each of which he reported net profits of about $3,000), however, food from the store fed four or five persons, including growing children, and the petitioners withdrew $25 per week for personal use. Premiums were paid on life insurance policies in the face amount of $3,000 and $2,000, and installment payments of $29.10 per month were made for "Investor's Syndicate" securities during this period. In 1942, Frank gave $800 to Raffaela's mother and bought a 1942 Dodge automobile. In 1943 he paid $4,264.59 toward the purchase price of the store building. Also during this entire *88 period, some personal and other nondeductible expenses were paid by check from the checking account. All of the foregoing add to the clear inference that Frank must have realized that his actual income exceeded what he reported. For all of the reasons set out above, we believe that respondent has met his burden of proving by clear and convincing evidence that part of the deficiency for each of the years 1942 through 1944 was due to fraud with intent to evade tax. Accordingly, an addition to the deficiency for each year of 50 per cent thereof is authorized by section 293(b) of the Internal Revenue Code of 1939. Petitioners contend in this respect that Frank's personal attributes indicate that he was negligent rather than fraudulent during this three-year period. It is true that Frank was an uneducated man. He was not, however, an unintelligent man. He understood his obligation to file true in come tax returns and to pay all taxes due. He knew that each of the returns for the year 1942 through 1944 understated total receipts and net profit by substantial amounts. Moreover, he made no effort to maintain accurate business records during this period (despite the advice of the accountant), *89 and he made no use of the available records (invoices, cancelled checks, and bank statements) which would have resulted in more accurate returns. We believe that these acts were part of Frank's fraudulent plan to evade his income taxes. Petitioners also contend that we should hold only that there was negligence in the instant case because Frank relied in good faith upon an accountant. We disagree. The accountant did not keep Frank's books and records but merely filled out annual tax returns from information given to him by Frank. Although the accountant did estimate some of the deductions in each return because of the lack of records, it was the understatement of total receipts by Frank which resulted in the understatement of income in each return. Furthermore, Frank went over each of the returns with the accountant before he signed it. Under these circumstances, we believe that it was the accountant who relied upon Frank and not vice-versa as contended by petitioners. We need hardly add, however, that the accountant had no proper basis for such reliance. We now turn to a consideration of the years 1945 and 1946. In each of those years, unlike the earlier years, the amount of reported *90 receipts exceeded the receipts deposited in the checking account. In 1945, the total deposits were $51,584.89 of which $48,655.89 were business receipts. The return for that year, however, reported total receipts of $52,584.93 which exceeded the bank deposits. In 1946, deposited business receipts totalled $25,718.74 while reported receipts were $26,586.42. Under these circumstances, even if Frank had produced his bank records for the accountant, the amount of total receipts would not necessarily have been more accurately reported in the return for each year. In these years, therefore, there was lacking the most significant indication of concealment which had been present in earlier years. The years 1945 and 1946 also differ from the earlier years with respect to the extent of the understated receipts and unreported net profit for each year. The total business receipts were understated in 1945 by $6,304.70 and in 1946 by $1,865.74. After subtracting the cost of merchandise allocable thereto from the unreported receipts (65%) we have determined that the unreported net profit from the business for each of those years was $2,206.65 and $653.03, respectively. While these amounts are, *91 of course, significant, they are far less than the substantial understatements attributable to the earlier years (see Schedule E of our Findings of Fact) and are not of themselves so substantial as to give rise to clear inference or imputation of fraudulent intent to evade taxes. We condone neither the understatement nor the failure to keep proper records. At the same time, we must remain mindful of the burden upon respondent to prove fraud by clear and convincing evidence. In our opinion, he has not succeeded in doing so for the years 1945 and 1946. The remaining issue raised by petitioners is whether or not the assessment of any of the deficiencies in the instant case is barred by the period of limitations. With respect to the years 1944 through 1946, the time for assessment was extended by agreements pursuant to section 276(b) of the Internal Revenue Code of 1939. The Notice of Deficiency was therefore timely with respect to those years. Although no waivers were executed for the years 1942 and 1943, we have found that the returns filed for those years were false and fraudulent with intent to evade tax. Accordingly, we hold that assessment of the tax and penalties for those years *92 is not barred by limitations. Section 276(a), Internal Revenue Code of 1939. The 1943 return was the only one involved in the instant case which was filed jointly by the petitioners. All others were individual returns and were filed by Frank only. Petitioner Raffaela DeMartino signed the 1943 return when it was presented to her without investigating its contents, and there is no evidence that she knowingly took any part in Frank's fraudulent activities. Nevertheless, she is jointly and severally liable with her husband for the deficiency and penalty under section 51(b) of the 1939 Code and there is no limitation upon an assessment against her for that year. Howell v. Commissioner, (C.A. 6, 1949) 175 Fed. (2d) 240, affirming 10 T.C. 859. Decision will be entered under Rule 50.